May be seated the clerk will call the next case. 315-0502 consolidated with 315-0506. Rebecca Kopinski was administrator of the estate of Daniel W. Kopinski, deceased. Anthony Mercullio v. Nina Pujarti, M.D. Appellant by Robert Larson and Central Illinois Pathology Appellant by Andrew Smith. Mr. Larson are you going first? Yes I am. Each of you will have seven and a half minutes. You may proceed. Good afternoon your honors, counsel, may it please the court. We begin this case with the premise that this was a close one on the facts. I think the court is well familiar with the standards set forth by the Illinois Supreme Court in Booth v. Nelson that in such a case where the jury could have decided the case either way, any substantial error that might have tipped the case in the favor of one side or the other calls for a reversal. This is not even an issue in dispute. The briefs I read it is clear that everyone agrees this was a close case. The jury deliberated for over ten hours over two days before reaching its decision. So we have to look at the case through that prism. With that as the relevant standard I would like to focus on two issues and then I will defer to Mr. Smith with respect to the rest of the issues raised here. Those two issues are the first and foremost being the one I think is really the dispositive issue here which was the trial court's decision to limit the ability of Dr. Andrade's counsel and counsel for central Illinois pathology to fully participate in their respective defenses of the case. To deny the defense their full representation of their chosen attorneys. So that only one attorney got to do an opening statement. Only one attorney got to do a closing argument. Only one attorney got to question each of the various witnesses called against their clients. And only one of them got to object during the cross examination and questioning by Plaintiff's counsel. And then the second issue I would like to address briefly is how the conduct of counsel, Plaintiff's counsel during the course of the trial interacted with that decision of the trial judge. First in leading to that decision of the trial judge and second in interacting to deny the defense a fair trial. These are the issues that really bring the context for the remainder of the error and how it impacted the conduct of the case. There are a few rights that are more fundamental in the law than the right to counsel. Especially when a doctor as Dr. Gujarati was here is personally at risk for liability. Plaintiff's counsel did not need to name Dr. Gujarati as the defendant in the case. Yes, Dr. Gujarati and CIP were named as principal and agent. Dr. Gujarati did not need to be in the case for CIP to be liable for her conduct. Counsel chose to bring her into the case and chose to keep her in the case through the trial to see if he got a large verdict that could then be enforced also against Dr. Gujarati. And yet despite her personal financial exposure and the consequences for an individual doctor which are different from those of a corporation in getting a verdict against them, he asked the trial court and the trial court agreed to limit the ability of her chosen attorney to fully participate in the trial. This denied Dr. Gujarati a fair trial. In their response brief, Plaintiff makes much of the fact that Dr. Gujarati and CIP were sued as principal and agent. Yet they could not cite a case, I could not find a case, and I don't know that the court has found a case in the history of Illinois jurisprudence where that relationship alone justified denying one party or the other the right to the full participation of an attorney of their choosing. I just tried a case out in the third district three weeks ago where we had the same situation and that wasn't the remedy that was provided by the court. Dr. Gujarati and CIP are separate entities. They face joint and several liability. They are aligned but being aligned is not the same thing as having identical interests. Plaintiff's counsel knows this. Dr. Gujarati was sued as principal and agent but there is a difference in their relationships. So this is not a new or novel situation that was faced by Judge Holland when this motion was brought by Plaintiff's counsel. In fact, this court faced that very issue when this matter was brought up on appeal. Plaintiff's counsel asked this court to say only one of the two defendants should be allowed to file a brief. And this court recognized that that would be improper, that there are two separate legal entities here, a doctor and a corporation, and they both have separate attorneys and both attorneys should be allowed to present their arguments. There are ways to do that efficiently without repeating the arguments of one another, but you don't just deny one party or the other the right to present their case. And that's very similar to the way the issue was presented in the case of Taylor v. County of Cook, a case that was cited extensively in our briefs where the court found that, yes, the defendants can be identically aligned on an issue but they're still entitled to present their own experts. They are not required to rely on the presentation of evidence by another entity even where their interests are aligned. But it doesn't stop there. The Illinois Supreme Court has very specifically addressed this issue in Supreme Court Rule 213G. In cases like this one with multiple defendants whose interests are aligned, the rule says specifically this, the cross-examining party may not elicit undisclosed information, including opinions, from the witness on an issue on which its position is aligned with that of the party doing the direct examination. The Supreme Court could very easily have said the cross-examining party may not question the witness on an issue on which its position is aligned with that of the party doing the direct examination. They chose not to do so, and they chose not to do so because there is a better way to handle the problem. You can say you can't sneak into opinions of the trial, you can't use the relationship between the defendants to try to bring in undisclosed opinions, but you do not deny a party the right to their representation of the lawyer of their choosing. This is a simple and effective means of controlling the presentation of the evidence, and yet that's not what the trial court did here. The plaintiff's counsel argues in their brief that Judge Holland did nothing more than exercise the discretion he's given under Illinois Rule of Evidence 611A. Unfortunately, that's not the case. In fact, what Judge Holland did was not exercise discretion. He didn't exercise discretion at all. He, in fact, abandoned his discretion and said, I'm not going to try to sort through these questions. I'm not going to deal with this on a case-by-case basis. I'm just going to divvy up the trial. I'll let you conduct half of it, and you conduct half of it, and that way I don't have to make these calls. That trial judges make in every case where there are multiple defendants throughout the state every day. He just didn't want to do it. And what reasoning did he give for not doing it? Well, Judge Holland articulated that, I think, to allow multiple closing arguments, to allow multiple opening statements, and to allow multiple questioning would have prejudiced the plaintiff, in this case, and would have been an inefficient use of trial time. He also said, I don't want to keep dealing with questions, nuances of questions. I want it to run efficiently. Well, the efficiency of the trial process is not so important as to allow the court the ability to deny a defendant their right to counsel. There are ways it can be handled efficiently without saying you're not allowed to ask questions of a witness, or you're not allowed to give an opening statement, or you're not allowed to give a closing argument. What questions were not able to be asked? There are countless questions, Your Honor. Every single witness, there were, as Your Honor may recall, a number of expert witnesses presented by a plaintiff that had cumulative testimony, and there were ways that those cross-examinations would be conducted by one of the defense counsel, and different ways they would be conducted by the other defense counsel. What information would have been requested, or what questions were you forbidden from making an inquiry on because of the judge's decisions with regard to the dual representation, I mean, with the two attorneys? I think that's a fair question. I think the answer is it's impossible to know that. The right to counsel is specifically designed to say, we don't know how you might present your evidence, but you have the right in an adverse setting to make those strategic calls, and you don't have to rely on somebody else's attorney to do that for you. And counsel's suggestion and the court's suggestion was, well, maybe you can pass notes in class. Maybe you can just ask each other to ask this other question. I've been practicing for a long time. I know you don't do that in front of a jury. It makes you look unprepared. It makes you look unprofessional. And it's certainly not an efficient way of using the court's time when you have to stop, take a break, talk to each other, say, hey, can you ask this question for me? Can you ask that question for me? It's obvious why I'm asking the question because generally when something is done that has a prejudicial impact on one side or the other, there's information provided, the examples of the prejudice. And what you're stating is the prejudice is by the very fact it was done is per se prejudicial. Yes. And that's the way you're presenting it. Absolutely. But rather than give any particular examples. Well, Mr. Smith can speak to this a little bit, but there were certain places where he objected and indicated he would have made different objections and asked additional questions had he been given the opportunity. But certainly he could not even. The opening statement and closing argument, you always try to tie those two things together with the evidence that's presented. But when one attorney has to do the opening statement to present their road map of the case, and then the co-defendant's attorney has to try to follow that road map in their presentation of the evidence, and then the other attorney does the closing argument to try to tie it all together, that's just not an efficient or effective way for the defense to present their case. The jury could have been speculating as, well, why didn't Dr. Gujarati's attorney ask a single question of this witness? Why didn't CIP's attorney ask a single question of that witness? Or why didn't they give an opening statement, and why did they give a closing argument? So there could be countless examples of how that's done. The way a question is phrased is very important, which is why you choose counsel, why certain trial counsel are chosen over others because of their ability to ask a question in a certain way. And it may be the very same topic, the very same information they're attempting to elicit, but the manner in which they elicit it is different, and its impact on the jury is different, which is why we hire the attorneys of our choosing. Why didn't the second attorney come in for the trial or the case? There are a number of reasons that are related to insurance proceeds,  the doctor's end to the relationship with the group, that all came into play into that decision-making. Some of those things sort of get into attorney-client privilege issues as to why, but I don't think the reasoning of why affects their right to representation of their choosing at trial. And with that, I think I've more than used up my time. May it please the court, counsel? I concur with Mr. Larson's thoughts on that. I would like to speak to your question, Justice Carter. One definitive area in which the prejudice was real was in the opening and the closing,  and that was by Judge Holland's ruling at the trial court, the non-speaking attorney, only one attorney was allowed to speak as to any one witness, and the question was raised, well, what about objections? And his answer to that was, well, the speaking attorney can make objections on behalf of both clients. And so through the pendency of this trial, each person who was the speaking attorney at that point in time was responsible not only for handling all of the questions, but was de facto knighted the counsel for somebody that wasn't their client. When I was up there asking questions on behalf of CIP by Judge Holland's ruling, I was supposed to be making objections on behalf of Dr. Gujarati. That, I think, is a concrete and material prejudice to the parties, and I would reiterate the idea that the right to open and close a case is a very significant one, and as Mr. Larson said, to expect co-counsel to follow a road map that I lay out at the beginning is prejudicial, and to expect him or expect me to remain silent at the end and not have the opportunity to sort of fit the facts into my own perception to the jury was a significant prejudice. What are the salient differences between the legal issues with regard to the two defendants? Well, they are legally aligned. I mean, it's an employer-employee, but as Mr. Larson said, their interests are not identical. The corporation has a different interest in terms of protecting its assets, and without getting into attorney-client communications, there could be very different perceptions, very different motivations between the two entities as to defend, settle, how to try the case, what end goal to point to. But I'm specifically asking that with regard to the trial itself, because that's where the alleged difficulty is, is the way the trial is conducted, not if it was hypothetically going to be settled or not settled. Yeah, but it is a different manner in which a party would approach a trial dependent on what its end motivation was, whether your goal is to work the case over towards a settlement posture, whether your goal is to defend it to the end, whether your goal is to defend it on liability, whether your goal is to defend it on damages. Those are things that parties can have very different perceptions of. Well, leading up to trial, you were able to work on that separately, right? That is true, and the fact of the matter is that these cases have sort of an organic life of their own, and I think, as you know, perceptions of the parties who are being sued tend to change quite dramatically as the trial date approaches. I didn't mean to reiterate or keep talking about what Mr. Larson started with. The other issue I wanted to talk about was the statute of limitations. I do have a question about that, because it's my understanding from Mr. Larson's argument that there were some specific objections that you made regarding your inability to ask some questions or something. Can you give me some specifics on that? Your Honor, the specific one that I can cite to is I think it was one of the first witnesses, and I just wanted to make a record at the beginning, and so one of the first witnesses came up, and it was sort of the first situation of I'm the non-speaking attorney, and I cited to it in my brief, where at the end of the examination I said on the record, I just want the record to reflect, I wasn't able to make any objections, I wasn't able to open my mouth while this person was being examined. I can't cite to you a specific objection over the course of a three-week trial that was not made. There wasn't any, I guess for lack of a better term, no offer of proof, or I would have asked these questions. Very briefly, the fact of the matter is this case never should have gone to trial in the first place, because the claim was not timely filed. Moreover, when it was tried, the court I think was in clear error in concurrently denying a directed verdict on the issue of statute of limitations for the express reason that fact questions precluded that ruling. So I basically renewed my motion for summary judgment at the close of evidence. Judge Holland said there are fact questions that prevent me from granting a directed verdict on the statute of limitations. Fine. In the next breath, the court entertained plaintiff's motion to direct a verdict on my statute of limitations affirmative defense. And on the exact same issue, and on the exact same facts that Judge Holland said precluded entry of a verdict towards me, the court directed a verdict on the affirmative defense. And so those same facts that created a question of fact on my motion did not create a question of fact on plaintiff's motion. And he denied my motion, and he struck my affirmative defense. So having found that there were questions of fact, it was my right to submit that fact question to the jury and to have the jury decide when did this plaintiff know or reasonably should have known that a cause of action existed. And he denied that right. And those two things are mutually exclusive. They are internally in conflict. You cannot have two diametrically opposed motions and say that one creates questions of fact and the other does not. It makes no sense. And the underlying question is, was this claim filed on time? Well, it's filed under the notion that the plaintiff was not aware of negligence until some point further down the road. And the question of fact that precluded entry of the directed verdict on my behalf is, well, when did the Kapinskys know that some error had been made? So the fact is, Dr. Gujarati allegedly committed negligence on March 26, 2007. It was January 29 of 2009 that the Kapinskys met with a Dr. Atkinson up at Mayo Clinic. And it was on that date, prior to that date, that Mr. Kapinsky's symptoms had returned but new and different symptoms had come, different from what he had had the first time when this mass was discovered in his brain. And it was on that January 29, 2009 date that Dr. Atkinson at Mayo Clinic told them this is not behaving like a benign meningioma as Dr. Gujarati had diagnosed. This is behaving much more aggressively. This is behaving like a malignancy. And Mrs. Kapinsky on the stand said when she heard that, she specifically thought cancer. So she specifically had knowledge on January 29 of 2009 that this lesion that Dr. Gujarati had said was a benign meningioma might be cancer. That's the trigger date. It's that date that put her on notice to explore and to determine if it was caused by some act of negligence. The claim was filed more than two years after that January 29, 2009 date. And the rationale that the plaintiff's counsel has used throughout this case is, well, it wasn't until two weeks after that, or ten days or something, that Mr. Kapinsky went to a different provider where a definitive diagnosis of cancer was made. And I would propose to the court that the definitive diagnosis of cancer does not usurp the suspicion or knowledge of a malignancy that was communicated on the 29th of January 2009 by Dr. Atkinson. The definitive diagnosis of cancer does not, in fact, point them any more directly to the fact that some error may have occurred than what they already knew back in January. That's the fact, and that's why the court should have granted the motion for summary judgment in the first place, should have granted the motion for a directed verdict, and at the very least, having denied both those motions, should have denied the plaintiff's motion to eviscerate a very legitimate affirmative defense and take that out of the jury's consideration of the case. So that, I believe, was an error on the court's part. It's similar in a way, or I think directly similar to the Moon case that this court ruled on in the last year or two. In that case, one of the rationales that the plaintiff used for trying to file more than two years after the original injury was he said, well, it wasn't until a longer time after that that an attorney or a doctor told me that some negligence had occurred. It wasn't until more than two years later that this physician who reviewed the x-rays in the Moon case said, the radiologist missed the diagnosis. A little bit different in that case because in Moon it was a death case, and so this court said, well, your mother dying is a pretty clear indication that maybe it's time to start looking into this thing. And in the Moon case, the plaintiff's attorney had waited a significant amount of time before he even sought the records or submitted them to an expert. But the same rationale occurs or is evident there, and this court, in its opinion, in the Moon case, cited to the Supreme Court where it said, if being told flat out that negligence occurred was the trigger moment, every case would be delayed. You could sit around for three years and 11 months and still file your lawsuit if the only thing that you needed was for some doctor or lawyer to say negligence occurred in the case. That's not the dispositive inquiry. It's what would a reasonable person, at what point would they have reason to discover, to investigate whether some negligence had occurred. In this case, that date was January 29 of 2009, and the claim being filed on February, I'm sorry, March, February 4, 2011, that misses the deadline. That's more than two years after that operative date. So for that reason, I think the verdict should be not just reversed, but I think it should be directed, returned to the trial court with instructions to enter a directed verdict on the motion for a, or enter an order on the motion for the directed verdict. I don't think we have any questions at this time. Okay. Thank you. Mr. Riccolia. My name is Riccolia, and I represent Flint. First of all, I'd like to begin by representing to the court my rebuttal to Mr. Smith. The statute of limitations case, as we look at the record, needs to be brought back all the way through to March 7th, when the original defect in the evaluation of the specimens took place. I say that because on March, in March of 2007, the plaintiff had a surgical procedure where a specimen was presented to the pathologist. The pathologist diagnosed the tumor specimen as a meningioma, a benign meningioma. And that order was confirmed by the defendant in March, March 26, 2000, I believe it was March 26, 2007. So if you apply the four years statute proposed, we would have had until March 26, 2011 to file the case. However, that's only brought out for the court's information. But what's important is that following the diagnosis of the defendant in the case, the neurosurgeon brought in a radiologist to perform a treatment on that tumor. And because it was a treatment that was testified to by our experts as not being sufficient, and in fact prevented further treatment, and I'll get into that, in the future when he had been diagnosed with cancer. The importance is that the radiologist, and it's in the record, said to Mr. Kropinski, you can expect to have a potential for this tumor to regrow. And if it regrows, you're going to have the same symptoms as you had prior to your surgery from Dr. Lanzino. Dr. Lanzino is the neurosurgeon that did the surgery at OSF. In addition, the radiation was performed, took seven weeks before it was completed. The plaintiff, during the course of this period of time, worked 60 hours a week, 12 hours a day. And he did, in 2008, begin to have the same symptoms as he had had in 2007. Vision problems, dizziness, a number of throwing up, a number of different problems that brought him to Dr. Lanzino initially. They went back to OSF, they being the plaintiff and his wife, and saw Dr. Kattah. Dr. Kattah was an ophthalmologist oncologist. And he diagnosed the problem that Mr. Kropinski was having in mid-summer of 2008 as being a side effect of the radiation that he had had. And that continued on, the side effects, until finally they made an appointment to go back to see Dr. Lanzino. Dr. Lanzino, in the meantime, had moved to the Mayo Clinic. So as a substitute, there was a Dr. Koppenstein, who was the neurosurgeon. He's the neurosurgeon. He saw the plaintiff on January 20, 2009. At the time that he saw the plaintiff, he indicated to the plaintiff that the tumor had regrown and was set for surgery for February. Well, the plaintiff wanted to see Lanzino. He wanted to go to the Mayo Clinic, and he did make an appointment to see Dr. Lanzino. He saw Dr. Lanzino on the 28th. Dr. Lanzino told him that I no longer do this kind of surgery. I'm going to let you see Dr. Atkinson. Dr. Atkinson, at no time, and if you look at the record, and if you look at the video, because that's important, it was a video evidence deposition, you look at that video, he admitted that he didn't even remember these people, but that he would testify in all likelihood with the situation that was described to him in a certain way. He ordered an MRI. The MRI came back with cancer and potential suspicious cancer in the bone and in another area of the body, and I asked Dr. Atkinson in cross-examination, is that in any way related to the meningioma? And he said no. So, on the 29th, there was absolutely no reason for the Kapitskys to believe that that tumor was now cancer. And by the way, it's in the record that meningioma can turn into a cancer over a period of time. So, there is nothing that these people knew that would lead them to believe that there was a defect in the pathology of Dr. Giugiarotti's evaluation until  they figured out, and that was on the 6th and the 9th, and then Pittsburgh decided that it wasn't a meningioma, the pathologist, that it was actually cancer. But the formal evaluation with the actual specimen, because Pittsburgh didn't have the actual specimen. They just took the specimen out of the brain when they did the surgery two years later. This actual specimen was looked at by Dr. Taxi at the University of Chicago, and he formally provided an evaluation using the same specimen that it was a renal cell cancer. Now, my argument to the court is this. First of all, the summary judgment aspect is a red herring. It is true that they filed a motion for summary judgment on the statute of limitations, and it was denied by the court. Then what happened was the affirmative defense was pleaded, which means now you have to prove a prima facie case, just like I had to prove a prima facie case. Now we will file an affirmative defense. This court knows that you have the same burdens that you would have had had you been a plaintiff. When I moved for the motion for directed verdict, at the close of all the evidence, the only evidence that the defense had in this case was Atkinson. That's it. Atkinson. And there is no way that any reasonable court could assume that the testimony of Atkinson, with nothing further, could provide that defendant with a prima facie case. First of all, if you look at Mackey, which is a decision that was provided by this court in 2015, Mackey says there are two elements. First, you have to be suspicious. You have to have the injury, and then you have to have knowledge that what's happening to you was as a result of the negligence of a partner. Neither of these two elements existed in this case. Neither one. Whether you follow Mooney or not, well, Blackie was a decision after Mooney, by the way, and it's a third district case. Different judges. But even if you follow Mooney, you still have to use the reasonable approach to the record in this case and say that there was nothing in the record that would lead Mr. Kapinski to think that he had cancer instead of a benign meningioma on January 29th. Therefore, that issue of whether or not there's a question of fact that Mr. Smith raised is no longer on the table because there was nothing in his affirmative defense process in front of the jury that would allow the judge to let this case go to a jury. There was no prima facie case. What could the jury decide? Think about it. Sending acrimonious testimony to them. Would it be reasonable for them to come back with a statute of limitations verdict? I think not. Because there was nothing else in the record. Mr. Smith and the defense in this case put their entire eggs in one basket. The January 29th basket. That's the basket. Because they conceded that it was not on the 4th that when I filed they said it's not on the 4th when I filed this case, but on the 29th is when I should have filed it. So they conceded that this was everything else before that would not apply. That's in their record. As far as dual representation, this boggles my mind because Justice Litton, you asked about the financial aspect. We argued that. The financial aspect in this case was as it always is in every case. You have a single limit for one individual defendant and then you have a combination limit for a number of accidents, a number of plaintiffs. In this case CIP had a single $5 million limit with a $20 or $25 or $15 million back end in the event that there were multiple plaintiffs that received an award. When is justice dependent upon what kind of insurance a party has? I've never heard of that. You go to court based on the evidence in a case. You don't ask a party, what is your insurance coverage? You need a lawyer because you're insured. And even if that's true, the lawyer sits in and says nothing. The dual representation here is another red herring. These people were the two defendants were vicarious liability. And it was conceded that that's what the relationship was. And Judge Carter, you asked the right question. What questions would have been posed that caused prejudice to them because they both didn't get the privilege of dancing around the courtroom and questioning witnesses or giving the opening statements. 611 gives you as a trial judge the discretion to actually run your own courtroom. And that judge did exactly what he was entitled to do under the statute. As a matter of fact, he went even further. He allowed them to take depositions, to argue motions, to file motions separately, to argue motions separately. He allowed them to set up everything separately except he would not allow them to give double opening statements, double final arguments. He allowed them to choose between the two legal attorneys who should make the questions to the witness and who should make the objections. That's perfectly within the discretion of the court. They talked about CIP. What would happen if Judge Holland was faced with this? There were 15, it was testified in the record, 15 members of CIP. That's the association that what if each member, and I know this sounds ridiculous, but if you go on with the defense of the case, it's possible that that could happen. Each CIP member hires their own lawyer because they're seeing the financial aspect. So now we have 15 lawyers representing CIP. On what? On the same issues that they're responsible for as being the principal on an agency-principal-employee-employer relationship. Would it be an abusive discretion for Judge Holland to say, no, I don't think I'm going to allow 15 lawyers to ask questions, 15 lawyers to give open state? Now, you may say to yourself, well, Mr. Raccoon, that's ridiculous. I mean, he could stop that. He doesn't have to, in his discretion, he wouldn't have to do that. Well, if you say that, then it's also in his discretion to do it again, to require one lawyer to do the questioning on an alternate basis, if they choose, or however they choose to conduct the trial. And they themselves told you that it's the way the trial takes place. One lawyer may ask questions differently. Not questions they were not allowed to ask, but in the manner in which they proposed these questions. And I don't see that as being a significant aspect. That has to do with not with whether they got a fair trial or not. They both had the opportunity to prance in And they actually did. When they finished with a witness, Mr. Smith or Mr. Vadreen would say, just a minute, Your Honor. Can I have a minute? The judge said, yes, you can. And they would confer. And then Mr. Smith would come back. Many times he'd ask three or four more questions. Many times he'd say, we have no further questions. And that's in the record. It's in the record and it's in my brief. I also have, that's only two things they presented to the court. But I would like to add to my argument the issue of my expert witnesses. Dr. Vogel, first of all, you should know that Mr. Smith's firm handled this case for almost three years by himself. It was only within a matter of four months before the trial started that the Vadreen Cunningham firm came in and entered their appearance. I objected vehemently about that and the judge nevertheless allowed Vadreen to enter his appearance with the condition that the trial date stayed, that it wasn't going to be continued. During that period of time, three or four months after the Vadreen firm entered their because Mr. Vadreen was, continued depositions because Mr. Vadreen was on trial. The case got continued in March because of a conflict that the Vadreen firm had and was scheduled for June 16th. Unfortunately, Mr. Kapinski died. But in that interim period, the defense in this case made a motion and it wasn't, the record misrepresents that I agreed to this. I did not. Made a motion to get ten cuts from the specimen block that was left the seven years before with the representation to the court that it would probably be dispositive of the case if they could have these ten new cuts to have an expert would look at these and make decisions. I objected. I continued to object. The judge finally ruled, well, I'm going to let them do it. But if they do it I would make an objection to the court. This has nothing to do with the issues raised by the defense on appeal. I don't know if counsel is proposing essentially to counter appeal that hasn't been raised in the plea. Your objection is noted that your appeal does raise as an issue Dr. Vogles the admissibility of his testimony. I think I was explaining that there was some reference I don't know if it was in your brief that he had agreed to the ten cuts and he was clarifying to us that he didn't agree, which that is in the record that he did not agree to that but he was allowed to take as many samples as were your clients. I think we have that information. As a matter of fact, in my brief, Judge, I put the order in that the court entered and it was clear in there that I objected but it was also clear that I was allowed to have the same rights that the defendant had which was to have those cuts evaluated and then to make a review by the same expert I had hired before, the pathologist and he came back with the opinion that this was cancer. Again, he repeated his original opinion and as a matter of fact, I did disclose that to the defendant and as a matter of fact, they took, and it's in the record, they took his deposition that summer after the case was continued until September. So their argument about his being allowed to give a late opinion is without merit. It was their initiation of the motion for protective order that brought the cuts into play. It wasn't the plaintiff that brought that into play, it was the defendant. So the judge allowed me to get the, he allowed the cuts and allowed me to have the same rights as the defendant which I did and that's what he testified to. He testified to his original and to his supplemental review of the ten cuts that were offered to the defendant by the court to order giving them the right to have that. And then the other experts in the case, pardon? The other experts in the case were part of teams and they argued and questioned that right to have a team. That was according to the Heminger case where you just, you show what would have happened in order to give the plaintiff the opportunity for success for survivorship or cure. And everybody including Dr. McGee, the radiologist from St. Francis Medical Center who they called and I cross examined that when you have a renal cell cancer you have a team. You have a radiologist, a urologist, you have a neurosurgeon and you have a critical care doctor. All of whom I have represented in my brief existed and who are well qualified to testify and they all testified that had that happened there was a 10 to 15 percent chance that Mr. Kopinski may have survived. Am I out of time? Well, thank you very much. Any questions? Thank you. Mr. Smith, excuse me Mr. Larson for rebuttal. It will be very brief. I know we have a short period of time. I'm going to try to take a couple of the points that counsel just raised. I'm not sure exactly what point he's trying to make with respect to suing all the principals of CIP. Something to do with piercing the corporate veil or something. But if every individual member somehow pierced the corporate veil and the individual owners of CIP got sued, absolutely, indisputably, positively each one of them would have had a right to a counsel of their choosing. No question. The Constitution guarantees it. Certainly they would have. Could they all ask the exact same set of questions over and over and over again? Probably not. That would be for the court to exercise its discretion in determining what is cumulative evidence or what is unnecessary. But would the court say, yes, I know the corporation is broken up and you're all facing financial wound individually, but you're not entitled to have your own attorneys because you all worked together at one point. No way. No way would that survive under the law. In trials, would the trial judge have the ability to conduct the trial in an orderly manner? You can handle that as a trial judge by entertaining the objections during the full trial. Certainly. Questions raised, objections made, motions made, ongoing. It's a lot of flexibility. That would be the expectation we would have of the trial judge. But there are other ways, too, that on occasion, because of the nature of the case and the way the parties are aligned, there are some things that trial judges can do by setting the way the trial is going to proceed and who can do what. And isn't that what Judge Holland did in this case? I think he took it way beyond that, Your Honor. He didn't look at the evidence as the case was coming in. He said beforehand, I'm going to tell you what you can and you can't do as individual attorneys representing your clients. Not which witnesses may be called. Not which witnesses may be cumulative of one another. In every case I've ever raised a cumulative argument, I always get the same response in a motion eliminated from the court. Well, I'll hear the evidence and see as the evidence comes in whether or not it's cumulative. I can't decide that now. It depends on what questions are asked. In the record, the two attorneys were able to answer questions that were asked. The attorneys conferred to see if there was something else. Sometimes additional questions were asked. Sure, they did. And the analogy I would use to that is why is Mr. McCougley here rather than his associate? Attorneys are not fungible. And the ability of one attorney to ask a question a certain way or to cover a certain issue, even if they write out a question for their co-defendant's attorney, is not identical and it's not fungible. There's a reason why in the Miranda warnings it says you're entitled to counsel if you're choosing. Because you can appoint a public defender, but people choose their lawyers because of the specific abilities and styles of those lawyers for that case and how they present the question. And it may be you can't say after the trial, well, which questions would the public defender have asked differently? I don't know. He's not the one who conducted the trial. How can I ever answer that question? The point is I was entitled to choose who was going to represent me and to do so in the style they chose to do so and not rely on somebody else's choice of lawyer to determine how those questions will be asked, how those arguments will be made, and how the evidence will be presented. That's the problem. Is it a question then about style? If one attorney has one style, another attorney has a different style, and it's the choosing of style? Well, it's style and substance. There are different ways that evidence is presented. This was the case earlier. That's the reason I asked the earlier question. I am concerned about what is the substance of the difficulty, what substantively was problematical, what substantively was not able to be gone into, what substantively was damaged in this case? And there are a myriad of things. To be able to nail one specific thing is nearly impossible. It's like trying to prove a negative that it didn't affect things because essentially everything was covered. The point being that once you deny something, there's a reason why there's a right to counsel. You might say, well, you could ask the same questions. Everybody tells us that lawyers are going to ask the wrong things, but you hire another attorney to represent you because of their style and how they ask things. Well, it's obvious why I'm asking these questions, because is it a... if there's a problem in this area under 611, if a judge takes this control, is this concept of per se... you don't go behind what happened just by the very nature of ruling this way as per se improper? I believe so. And that's the way you're arguing it. Right. But is it that or is it that in this case, given the circumstances, there was a deprivation of the right of having your attorney of choosing because we were not able to go into this line of questioning. We weren't able to cover these matters because of the nature of splitting this up. But I don't hear any of that stuff. There aren't any specific examples. Given except style differences, because every time there's a different attorney, it would be pretty rare to have the same style. It's actually the same style by... But the style leads to the substance of the argument and the questioning. And the ability of two attorneys in a case where there were, I don't know, 20 witnesses presented in this trial to stop after each witness and say, all right, let's go through the last hour and a half of questioning. What did you miss that I'd like you to ask? And we've got two minutes while the jury is staring at us to scribble down some thoughts. You don't have two minutes. You've got that hour and a half. I mean, the other person is sitting back there and listening to the inquiry, right? The questioning. And so as you're going along in the questioning, I suppose, if something was not followed up, the other attorney would have jotted down a note or something if they wanted that inquiry to be made and said, well, I want you to follow up on this one question that you asked earlier. I mean, so it's not like you've got one minute to go over this. You've got the other attorneys sitting back there and listening to the whole line of questioning, correct? They are, but they're not able to. There may be a whole area of inquiry that the attorney who's sitting back at counsel's table wouldn't have gone into had it been their witness that they'd chosen. They would have conducted their examination in an entirely different way. And now they're faced with, well, gosh, we're an hour and a half in. I'm not going to be able to sit down with you and correct everything I think should have been done in a different way. If both attorneys were asking questions, because there would be some areas that one attorney wouldn't have gone into if they were asking, when they would ask the questions while the other one went into it, right? That's going to happen either way. Except that if the attorney can then get up and attempt to correct that by asking the questions themselves rather than asking the other attorney to formulate the questions based upon their thoughts on the fly and handing each other notes while the juries are watching you do that, if that was the simplest way to do it, then they would always do it. But again, the Supreme Court looked at this issue. They looked at this issue very specifically when they issued Supreme Court Rule 213G. And they said that's not the right remedy. The remedy is for the trial court to actually look at it on a case-by-case basis and exercise its discretion. Not just say, you don't get the question to witness if you guys are aligned on the issue. They could have put that in the rule and they chose not to. Are we talking about two different concepts now? 611 versus 213F&G questions? Which are the medical malpractice cases, the 13F&Gs, and that's all motions in front of a trial judge? I think they're interrelated. I think the court has looked at the issue of how a trial court conducts a trial and says when you have issues that are aligned, you can't slip into opinions. They could have also said you don't get to ask questions of your co-defendant's witness. They didn't do that. And they didn't do that because that would deny the co-defendant the representation of the attorney of their choosing who may ask a question in a certain way. I see that it appears we're out of time. So is the objection more theoretical, not specific, right? As to any specific individual question or exact issue, yes. I can't tell you this is the exact question that would have been asked by Mr. Verdreen when Mr. Smith was asking the question or by Mr. Smith when Mr. Verdreen was giving his closing argument. I can't point to exact specifics. It's just the global aspect of the case and how it impacted it.